IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CHILDREN'S MEDICAL CENTER OF DALLAS | § § § | |
| Plaintiff, | § § | |
| VS. | § § | NO. 3-04-CV-2436-BD |
| COLUMBIA HOSPITAL AT MEDICAL CITY DALLAS SUBSIDIARY, L.P. | § § § § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Children's Medical Center of Dallas and Defendant Columbia Hospital at Medical City Dallas Subsidiary, L.P. have filed motions to exclude the testimony of each other's experts in this trademark infringement action brought under the Lanham Act, 15 U.S.C. § 1051, *et seq*. For the reasons stated herein, the motions are denied.

I.

Plaintiff is a not-for-profit hospital located in Dallas, Texas that specializes in providing medical services to children. For more than 17 years, plaintiff has owned a federally registered service mark[1] depicting the words "Children's Medical Center of Dallas." The word "Children's" is written in a larger font and appears above the words "Medical Center of Dallas." A red balloon on a string has been substituted in place of the letter "i" in the word "Children's." In addition to its federally registered service mark, plaintiff contends that it owns the common law service marks "Children's Medical Center of Dallas," "Children's Medical Center," and "Children's," all with and

---

[1] U.S. Registration No. 1,506,624 (issued Sept. 27, 1988).

without a red balloon representing the letter "i," for pediatric medical services in Dallas, Texas. (*See* Plf. First Am. Compl. at 2, ¶ 5; Jt. PTO, Exh. A).

Defendant is a for-profit hospital located in Dallas, Texas that provides a variety of medical services to patients of all ages, including specialized services to children. Beginning in 2002, defendant embarked on a campaign to increase public awareness of its healthcare services by promoting the Medical City brand name. As part of this branding campaign, defendant renamed various departments with the "Medical City" brand name, followed by a single-word description of the particular service offered in that department. Some examples are "Medical City Imaging," "Medical City Heart," "Medical City Women's," and "Medical City Cancer." In October 2004, defendant changed the name of its pediatric unit from "North Texas Hospital for Children at Medical City" to "Medical City Children's." Defendant is currently marketing its pediatric facility using the new name and a logo consisting of three elements: (1) a figure-like symbol, (2) the words "Medical City," followed by the word "Children's" in a stylized font, and (3) the themeline, "Specialists. In life." written underneath or next to "Medical City Children's." (*See* Jt. PTO, Exh. B).

Plaintiff believes that the name "Medical City Children's" creates confusion with respect to both its registered and common law marks. When defendant refused to abandon its marketing campaign using the "Medical City Children's" name and logo, plaintiff filed suit in federal district court for trademark or service mark infringement, unfair competition, injury to business reputation, and trademark dilution. The case is specially set for a jury trial beginning March 13, 2006. Plaintiff now moves to exclude the testimony of: (1) Dr. Carl Lenarsky, a pediatric oncologist who will testify that parents tend to select a hospital for their children based on the advice of their doctor and insurance companies; and (2) Jeffrey Samuels, an attorney and law professor who has reviewed the results of a search conducted by NameProtect, Inc., a trademark search firm, of the term "Children's"

as used in the healthcare industry.  Defendant objects to the testimony of:  (1) Henry D. Ostberg, the president of a survey research firm who interviewed more than 200 adults in the Dallas area to determine whether a hospital known as "Children's" has acquired secondary meaning; and (2) E. Allen Jacobs, an economist who attempts to quantify the amount of damages allegedly sustained by plaintiff due to defendant's use of the "Children's" mark.  The motions have been briefed by the parties and are ripe for determination.

II.

Fed. R. Evid. 702 governs the admissibility of expert testimony.  This rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if  (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. Effective December 1, 2000, Rule 702 was amended to incorporate the principles first articulated by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).  *See* FED. R. EVID. 702, adv. comm. notes (2000). Under *Daubert*, expert testimony is admissible only if the proponent demonstrates that:  (1) the expert is qualified; (2) the evidence is relevant to the suit; and (3) the evidence is reliable.  *See Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988-89 (5th Cir. 1997).  The trial court is charged with making this preliminary determination under Fed. R. Evid. 104(a).[2]  *Andrade Garcia v. Columbia*

---

[2] Fed. R. Evid. 104(a) provides:

> Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b).  In making its determination it is not bound by the rules of evidence except those with respect to privileges.

*Medical Center of Sherman*, 996 F.Supp. 617, 620 (E.D. Tex. 1998); *see also* FED. R. EVID. 702, adv. comm. notes (2000).

*Daubert* lists five non-exclusive factors to consider when assessing the scientific validity or reliability of expert testimony:

1. Whether the theory or technique has been tested;

2. Whether the theory or technique has been subjected to peer review and publication;

3. The known or potential rate of error of the method used;

4. The existence and maintenance of standards and controls in the methodology; and

5. Whether the theory or method has been generally accepted by the scientific community.

*Daubert*, 113 S.Ct. at 2796-97.  These factors are not necessarily limited to scientific evidence and may be applicable to testimony offered by non-scientific experts, depending upon "the particular circumstances of the particular case at issue."  *Kumho Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 150, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999).  In either case, the *Daubert* analysis focuses on the reasoning or methodology employed by the expert, not the ultimate conclusion. *Watkins*, 121 F.3d at 989.  The purpose of such an inquiry is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Skidmore v. Precision Printing and Packaging, Inc.*, 188 F.3d 606, 618 (5th Cir. 1999), *quoting Kumho Tire*, 119 S.Ct. at 1176.  Thus, the court "must review only the reasonableness of the expert's use of such an approach, together with his particular method of analyzing the data so obtained, to draw a conclusion regarding the specific matter to which the expert testimony is directly relevant."

*American Tourmaline Fields v. International Paper Co.*, No. 3-96-CV-3363-D, 1999 WL 242690 at *2 (N.D. Tex. Apr. 19, 1999), *citing Kumho Tire*, 119 S.Ct. at 1177.

The test of reliability is necessarily a flexible one. As the Supreme Court has recognized, the *Daubert* factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire*, 119 S.Ct. at 1175; *see also Watkins*, 121 F.3d at 988-89 ("Not every guidepost outlined in *Daubert* will necessarily apply to expert testimony[.]"). A trial court has wide latitude in deciding how to determine reliability, just as it has considerable discretion with respect to the ultimate reliability determination. *Kumho Tire*, 119 S.Ct. at 1176. Moreover, "the rejection of expert testimony is the exception rather than the rule." *See* FED. R. EVID. 702, adv. comm. notes (2000). *Daubert* did not work a seachange over federal evidence law, and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *See id.*, *quoting United States v. 14.38 Acres of Land, More or Less, Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996). Even after *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 113 S.Ct. at 2798; *see also In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717, 744 (3d Cir. 1994), *cert. denied*, 115 S.Ct. 1253 (1995) ("The grounds for the expert's opinion merely have to be good, they do not have to be perfect.").

### III.

Judged against these standards, the court determines that none of the challenged experts should be excluded prior to trial. The specific objections made by the parties to each expert will be discussed in turn.

A.

Plaintiff objects that the opinions expressed by Dr. Carl Lenarsky in his Rule 26(a)(2)(B) report "are without foundation and constitute speculation about the state of mind, knowledge, reasoning and mental processes of other persons." (Plf. Mot. at 3, ¶ 4). In his report, Lenarsky states, *inter alia*:

> The decision by a parent or guardian to admit a child to a hospital is among the most important decisions that a parent or guardian can make. It has been my experience that, in general, parents and guardians make careful and informed choices with respect to the hospitalization of their children, guided by the child's doctor. Hospital admission procedures at all hospitals with which I have been affiliated require a doctor to sponsor or admit each new patient. It has been my experience that a doctor's advice with respect to the choice of hospital is a critical consideration for parents and guardians in their decisions to admit their child for treatment at a particular hospital. Parents and guardians are also typically careful to consider insurance coverages which may be applicable to the child's care. The quality of care afforded by a hospital as recommended by a physician and the existence of insurance coverage are the two most important factors, in my opinion, with regard to parent's decisions to admit their child to a hospital.

(Plf. Mot. App. at 7-8, ¶ 5). Lenarsky goes on to state that, based on his experience in admitting hundreds of patients to pediatric hospitals over the past 25 years, mostly in the Los Angeles area, it is highly unlikely that doctors and insurance professionals would be confused by two hospitals using the name "Children's" in the same geographic area. (*Id.* at 8-9, ¶¶ 6-8). Despite his years of experience in counseling parents of sick children and his knowledge of the criteria considered by doctors and parents in selecting a hospital, plaintiff argues that: (1) Lenarsky is not qualified to offer opinions about the state of mind, knowledge, and reasoning process of others; (2) his opinions lack foundation and are not the product of reliable principles or methods; and (3) his testimony regarding the lack of confusion between different hospitals using the name "Children's" is not relevant.

The court rejects the argument that Lenarsky lacks the necessary qualifications to testify as an expert on the issue of confusion and that his opinions are unreliable. In a sworn declaration attached to his report, Lenarsky states that he has "counseled hundreds of parents and guardians with regard to their decisions to seek medical treatment and hospitalization of their children." (*Id.* at 2, ¶ 5). His opinions regarding the factors considered by parents in selecting a hospital are based on personal observations and participation in those counseling sessions over the past 25 years. Where, as here, expert opinion testimony is based solely on experience or training, application of the *Daubert* factors is unwarranted. *First Savings Bank, F.S.B. v. U.S. Bancorp*, 117 F.Supp.2d 1078, 1083 (D. Kan. 2000), *citing Compton v. Subaru of America, Inc.*, 82 F.3d 1513, 1518 (10th Cir.), *cert. denied*, 117 S.Ct. 611 (1996). *See also* FED. R. EVID. 702. adv. comm. note (2000) ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."); *Kumho Tire*, 119 S.Ct. at 1178 (recognizing appropriateness of expert drawing a conclusion from observations based on extensive and specialized experience).

A more difficult question is whether Lenarsky should be permitted to testify about the lack of confusion between different hospitals in the Los Angeles area that use the name "Children's." Although the parties disagree whether the relevant market for services provided by plaintiff extends beyond Dallas County, Texas, no one argues that the market extends as far as Los Angeles. Thus, plaintiff seeks to exclude any evidence of actual confusion outside the relevant market. However, evidence should be excluded prior to trial only if it is clearly inadmissible for any purpose. The better practice is to defer evidentiary rulings until trial so that questions of foundation, relevancy, and potential prejudice may be resolved in the proper context. *See, generally* 21 C. Wright & K. Graham, Federal Practice and Procedure § 5037.10 at 757-67 (2d ed. 2005). Such is the case here. Use of the name "Children's" by hospitals in the Los Angeles area may be relevant to determining

whether the word itself is generic and assessing the strength of plaintiff's common law mark. *See Sun Banks of Florida, Inc. v. Sun Federal Savings and Loan Ass'n*, 651 F.2d 311, 316-17 (5th Cir. 1981) (allowing evidence of extensive third-party of use of mark in other businesses across the country). Without the context of a trial and additional briefing by the parties, the court is unable to make a final ruling on this issue.

The court has little difficulty in allowing Lenarsky to testify that he experienced no confusion among doctors, parents, or insurance companies over the name Columbia Children's Hospital, "even though at the time there were other children's hospitals operating in this area utilizing 'children's' as part of their name." (Plf. Mot. App. at 9, ¶ 8). Columbia Children's Hospital was the name used by defendant prior to 1998. During that time, plaintiff and defendant offered the same services to customers in the same geographic market. Although plaintiff correctly points out that "Columbia Children's Hospital" and "Medical City Children's" are different names, such an objection goes to the weight of the evidence, not its admissibility.

B.

Plaintiff also challenges the testimony of Jeffrey Samuels, a professor at the University of Akron School of Law who teaches courses in trademark and unfair competition law. At trial, Samuels intends to offer his opinion regarding the factors that influence the strength of plaintiff's federally registered service mark. In particular, Samuels will testify that plaintiff's registered mark is "weak" and, thus, entitled to only narrow protection. (Plf. Mot. App. at 30, ¶ 7). His conclusion is based on evidence of widespread third-party use of the term "Children's" in the medical area, as revealed in a trademark search report prepared by NameProtect, Inc. (*Id.* at 28, ¶ 4 & 30, ¶¶ 8-9). Plaintiff objects that: (1) the NameProtect search report relied on by Samuels does not constitute "sufficient facts or data" to support his opinion; and (2) his conclusion that "plaintiff's rights in its

registered mark should be limited to the use by others of marks that include a balloon design element" does not conform to the test for infringement under the Lanham Act. (*See* Plf. Mot. at 6-10, ¶¶ 16-20).

An expert may base an opinion on facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject[.]" FED. R. EVID. 703. The underlying facts or data need not be admissible in evidence in order for the opinion to be admitted. *Id.*; *see also Soden v. Freightliner Corp.*, 714 F.2d 498, 502-03 & n.4 (5th Cir. 1983) (discussing types of inadmissible hearsay that may be relied upon by experts). In his Rule 26(a)(2)(B) report, Samuels states:

> NameProtect is one of severally nationally recognized services that provides searches of federal, state and common law trademarks. I am aware of NameProtect and its services and that its searches are generally relied upon by trademark practitioners when advising clients as to the availability of marks for use and registration.

(Plf. Mot. App. at 28, ¶ 4). This satisfies the requirements of Rule 703. In addition, several courts, including the Fifth Circuit, have held that evidence of third-party registrations is relevant to the scope of protection to be afforded a particular mark. *See, e.g. Petro Shopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 93-94 (4th Cir. 1997), *cert. denied*, 118 S.Ct. 1561 (1998); *First Savings Bank, F.S.B. v. First Bank System, Inc.*, 101 F.3d 645, 654 (10th Cir. 1996); *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1511 (2d Cir. 1997); *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 259 (5th Cir.), *cert. denied*, 101 S.Ct. 268 (1980). The court therefore determines that Samuels may base his opinion on the NameProtect search.[3]

---

[3] Plaintiff also argues that "Samuels has no idea whether a search report from NameProtect is reliable." (Plf. Mot. at 7, ¶ 17). This mischaracterizes the evidence. Although Samuels normally uses Thompson & Thompson, another nationally recognized trademark search firm, he testified at his deposition that the NameProtect report "parallels the organization anyway of Thompson & Thompson or any other search company's search reports." (Plf. Mot. App. at 53). That Samuels has no prior experience with NameProtect does not make the report unreliable.

Nor will the court prohibit Samuels from testifying at trial because he failed to discuss all the "digits of confusion" in his report. As plaintiff correctly notes, the Fifth Circuit has identified seven factors to be considered in assessing whether use of a mark creates a likelihood of confusion: (1) the type of mark allegedly infringed; (2) the similarity between the two marks; (3) the similarity of the products or services; (4) the identity of the retail outlets and purchasers; (5) the identity of the advertising media used; (6) the defendant's intent; and (7) any evidence of actual confusion. *See Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 484 (5th Cir. 2004). "It is sufficient if [p]laintiff shows that any of these factors demonstrate a likelihood of confusion[.]" *See Service Merchandise Co. v. Service Jewelry Stores, Inc.*, 737 F.Supp. 983, 991 (S.D. Tex. 1990). Here, Samuels appears to have considered only the type of mark allegedly infringed, the similarly between the two marks, and the similarity of products or services in concluding that plaintiff's rights in its registered mark "should be limited to the use by others of marks that include a balloon design element." (Plf. Mot. App. at 31, ¶ 11). While Samuels' report does not discuss all the "digits of confusion," it does not necessarily mean that his opinion is contrary to law. At trial, defendant will be required to establish a proper legal predicate before asking Samuels to offer an opinion regarding the strength of plaintiff's federally registered mark and scope of protection to which it is entitled. Defendant may renew its objection at that time if the proper predicate has not been established.[4]

C.

Defendant seeks to exclude the results of a survey conducted by Henry D. Ostberg to determine whether a hospital known as "Children's" has acquired secondary meaning among parents

---

[4] Samuels will not be permitted to testify as to the ultimate issue of whether of trademark infringement has occurred. *See Sam's Wines & Liquors, Inc. v. Wal-Mart Stores, Inc.*, No. 92-C-5170, 1994 WL 529331 at *2 (N.D. Ill. Sept. 27, 1994) (citing cases) (recognizing that it is improper to allow expert testimony by a lawyer "when the testimony is only intended to instruct as to the applicable trademark law"). Nor will he be allowed to instruct the jury as to the proper legal standard for proving infringement. *See Askanase v. Fatjo*, 130 F.3d 657, 672 (5th Cir. 1997).

in the Dallas area.[5] The Ostberg survey found that "[a] total of 58% of Dallas parents interviewed believed that 'Children's' identified one specific Dallas hospital, and specifically Children's Medical Center of Dallas." (Def. Mot. App. at 33). Defendant objects that the results of this survey are unreliable because: (1) the survey universe is not limited to parents or guardians who make healthcare decisions for their children; (2) responses are based on an improper leading question; and (3) only Dallas County residents were interviewed.

As a general rule, "methodological flaws in a survey bear on the weight the survey should receive, not the survey's admissibility." *Scott Fetzer Co.*, 381 F.3d at 488; *see also Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997), *cert. denied*, 121 S.Ct. 33 (2000); *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 523 (10th Cir. 1987). In extreme cases, improperly conducted surveys with slanted questions or serious methodological deficiencies may be excluded as "irrelevant" to the true state of mind of potential purchasers. *See* 5 J. McCarthy, McCarthy on Trademarks and Unfair Competition § 32:170 at 32-276 (4th ed. 2003). But a survey need not be perfectly conducted for the results to be admissible. *See AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir. 1993) ("While there will be occasions when the proffered survey is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible, . . . such situations will be rare[.]"); *see also* 4 J. Weinstein & M. Berger, Weinstein's Federal Evidence § 702.06[3] at 702-140 (2d ed. 2005).

---

[5] A descriptive mark is protectable only when it has acquired a secondary meaning in the minds of the consuming public. *See Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 540 (5th Cir. 1998). In order to establish secondary meaning, a plaintiff must show that the primary significance of the term in the minds of the consuming public is not the service, but the provider. *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 790 (5th Cir. 1983), *quoting Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73 (1938). Survey evidence is the most direct and persuasive way of establishing secondary meaning. *Vision Center v. Opticks, Inc.,* 596 F.2d 111,119 (5th Cir. 1979), *cert. denied,* 100 S.Ct. 668 (1980).

Ostberg surveyed 65 adult men and 157 adult women in Dallas County, Texas who live with a child under 18 years of age. (Def. Mot. App. at 34). Each person interviewed was asked:

> If someone mentioned a Dallas hospital to you, and called it "Children's," do you think "Children's"
>
> --   Identifies *one specific* Dallas hospital
>
> --   Or, describes *more than one* Dallas hospital which provides pediatric services?

(*Id.* at 35) (emphasis in original). Defendant correctly observes that the survey universe is not necessarily limited to parents who make healthcare decisions for children. Instead, potential respondents include adult siblings, babysitters, relatives, or friends living in the same household as a minor child. Defendant also believes that the geographic area of the survey is too limited and that the operative question asked of the respondents-- whether *a* Dallas hospital called "Children's" identifies *one specific hospital* or more than one hospital which provides pediatric services--is biased in favor of selecting the first response. Notwithstanding these alleged deficiencies, the court determines that the Ostberg survey has probative value and should not be excluded from evidence. *See E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292 (9th Cir. 1992) (objections that survey was conducted only in Southern California and asked leading questions go to the weight, not the admissibility of the survey); *Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925, 930-31 (7th Cir. 1984) (same as to survey of slightly broader universe than would be a perfect target group).

D.

Finally, defendant takes issue with the proffered testimony of E. Allen Jacobs, an economist who has been designated by plaintiff as an expert on damages. Jacobs will testify, *inter alia*, that plaintiff has sustained damages totaling $5.6 million. This consists of $3.5 million measured by a reasonable royalty for defendant's use of the name "Children's" and $2.1 million in corrective

advertising expenditures. Jacobs further estimates future damages in the amount of $89.5 million. (*See* Def. Mot. App. at 22, ¶¶ 46-47). Defendant argues that: (1) Jacobs has failed to establish a causal connection between the alleged infringement and plaintiff's damages; (2) his reasonable royalty model is flawed; (3) his corrective advertising estimates are unreliable; and (4) his report contains other inadmissible conclusions.

All these objections lack merit. It is not necessary for Jacobs, or any other damages expert, to establish the requisite causal connection between liability and damages. Rather, plaintiff may establish causation by other means. Nor is the court convinced that the reasonably royalty model used by Jacobs is fatally flawed or that his corrective advertising estimates are unreliable. Even if Jacobs arrived at a hypothetical royalty rate of 6% based on world-wide or national licensing agreements and negotiations outside the healthcare field, such a methodology is not so unreliable as to render his opinion inadmissible. Rather, defendant may challenge the method by which Jacobs calculates royalty damages on cross-examination and with rebuttal evidence. Similarly, whether the money plaintiff spent on its advertising campaign was necessary to counteract any public confusion resulting from defendant's use of the "Children's" mark is a matter for the jury to decide. *See Playtex Products, Inc. v. Proctor & Gamble Co.*, No. 02 CIV. 8046, 2003 WL 21242769 at *6 (S.D.N.Y. May 28, 2003), *aff'd*, 126 Fed.Appx. 32 (2d Cir. Mar. 28, 2005). The court also rejects defendant's argument that Jacobs impermissibly considered both lost royalties and the cost of corrective advertising in computing total damages. Other courts have allowed the recovery of both types of damages. *See, e.g., Zelinski v. Columbia 300, Inc.*, 335 F.3d 633, 639 (7th Cir. 2003).[6] With respect

---

[6] The only case cited by defendant in support of this argument, *Dial One of Mid-South, Inc. v. BellSouth Telecommunications, Inc.*, 269 F.3d 523, 527 (5th Cir. 2001), does not compel a different conclusion. *BellSouth* merely stands for the proposition that section 1117 of the Lanham Act restricts a court from awarding damages that are "punitive instead of merely compensatory." *BellSouth*, 269 F.3d at 527. In that case, the district court awarded $45,000 in lost profits to one plaintiff, $10,000 in lost franchise fees to a second plaintiff, and $100,000 in lost profits to a third plaintiff.

to defendant's claim that the calculation of future damages is irrelevant because "there are no circumstances under which [plaintiff] would suffer economic harm indefinitely," (*see* Def. Mot. at 12), the objection is premature.  The court declines to address any objection based on relevance outside the context of trial.

## CONCLUSION

Plaintiff's objections and motion to exclude the testimony of Dr. Carl Lenarsky and Jeffrey Samuels [Doc. #102] is denied.  Defendant's motion to preclude the testimony of Henry D. Ostberg [Doc. #104] and motion to preclude the testimony of E. Allen Jacobs [Doc. #111] are denied. The parties may renew their objections to these experts, if appropriate, at the time of trial.

SO ORDERED.

DATED:  March 10, 2006.

JEFF KAPLAN
UNITED STATES MAGISTRATE JUDGE

---

The damage awards were affirmed on appeal.  The court never considered whether the recovery of both lost royalties and the cost of corrective advertising constitutes impermissible "double dipping."